*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CEDRIC LEE GOLIDAY,

        Defendant-Appellant.

UNPUBLISHED
August 13, 2020

No. 348343
Berrien Circuit Court
LC No. 2018-003401-FC

Before: SHAPIRO, P.J., and SERVITTO and LETICA, JJ.

PER CURIAM.

Defendant, Cedric Lee Goliday, appeals as of right his convictions and sentences for second-degree criminal sexual conduct (CSC-II), MCL 750.520c, assault with intent to commit criminal sexual conduct involving sexual penetration (AWICSC), MCL 750.520g(1), domestic violence, MCL 750.81(2), and possession of marijuana, MCL 333.7403(2)(d). The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to 140 months to 30 years' imprisonment for the CSC-II conviction, 100 months to 20 years' imprisonment for the AWICSC, and to 97 days for domestic violence and possession of marijuana convictions. We affirm defendant's convictions and sentences and remand to the trial court for the limited, ministerial task of making the necessary corrections to defendant's presentence investigation report (PSIR).

## I. BACKGROUND

At trial, the victim testified that defendant was the uncle of her friend with whom she had been living. On August 25, 2018, defendant volunteered to drive the victim from Ann Arbor to Chicago. During the drive, defendant made numerous comments about how they should have sex at a hotel, an offer the victim expressly declined. Despite this rejection, defendant stopped at a hotel in Benton Harbor in the afternoon. The victim did not want to stop and rejected defendant's advances. Defendant exited the vehicle and the victim locked the door. Defendant attempted to reach in through the car window and pulled the victim's hair "really hard." The victim cut defendant's hand with a small pocket knife in response. According to the victim, defendant laughed and walked into the hotel. She had no money and no other way to Chicago. Eventually, defendant returned with a paper slip with the hotel room number on it.

The victim ventured up to the hotel room to use the bathroom and to persuade defendant to continue driving her to Chicago. She testified that she was "upset." Defendant "lunged" at the victim and she fought back. Throughout their altercation, defendant was angry and continued to talk about having sex. He took off his belt and hit her with it before he pushed her onto the bed and attempted to unzip her pants. He held her down. He also ripped the victim's shirt and began to lick her breasts. Defendant also bit into her back. The victim yelled "rape" and demanded that defendant stop. Once defendant and the victim were separated, she smashed a microwave oven plate into defendant's face. Throughout, the victim asserted that she "made it very clear" that she did not want to engage in any sexual behavior.

A guest in a neighboring hotel room overheard the altercation. She recalled hearing "squealing" and "yelling," and a woman stating, "He hit me. He bit me. He beat me." The guest called the front desk to report the disturbance. Her husband also testified that he heard the struggle and recalled defendant saying "I will kill you, bitch." The hotel manager, who responded to the scene, recalled the victim appeared "very scared" and was yelling that "[s]omeone's trying to rape me." The manager also testified that, in contrast, defendant appeared sweaty and his belt was undone. The manager called 911 and described how the victim "looked like she had just been through a bad ordeal, a fight."

Moreover, photographs of the hotel room introduced at trial demonstrated that the phone was ripped from the wall, the microwave on the ground, the television broken, a lampshade dented, broken hangers strewn about, the drapes bloody and ripped, and bedding bloodstained. Another hotel employee testified that she, too, saw defendant "pulling his pants up and messing with his belt." He "was mad" and was breathing heavily. The victim's clothes were ripped and bloody, her hair disheveled, and she was crying. The employee also observed scratch and bite marks. The victim told her that defendant "tried to rape her." At trial, an inmate serving a sentence on an unrelated case also testified that defendant had told him that "he was trying to get [the victim] to have sex with him and she kept turning him down," and that he enjoyed her resistance. The inmate described defendant as "bragging" and also remarked that defendant admitted to whipping the victim with his belt.

One of the law enforcement officers who responded to the scene testified that—in exchanges captured on body camera—defendant admitted that he licked the victim's breasts and held her down by her neck. Defendant also admitted to ripping the victim's shirt, that she was "screaming rape," and that he "kind of" liked that. Defendant believed that the victim owed him "sex as a payment" for driving her. According to the officer, defendant also threatened that the victim would not show up for court and denied that he raped her. Defendant did admit, however, that he was upset with the victim's rejection and that he hit her with his belt, but only in self-defense. Another law enforcement officer testified that defendant admitted that "he had feelings for her."

Defendant testified on his own behalf. He acknowledged that she did not want to go to the hotel and that she did not want to have sex. He believed that the victim, if she felt pressured, could have left. He asserted that she instigated their fight by "swinging" at him. He admitted to licking her breasts even though she repeatedly told him that sex "wasn't going to happen." He had anticipated that he would offer the victim money in exchange for sex because she did not have a

-2-

job and "might need some." He "thought she was playing" when she yelled rape. Defendant also again admitted that he held her down but maintained that they were "playing around."

The jury found defendant guilty of CSC-II, AWICSC, domestic violence, and unlawful possession of marijuana. The jury acquitted defendant of kidnapping and malicious destruction of property less than $200.

Defendant now appeals as of right.

## II. SUFFICIENCY OF THE EVIDENCE

First, defendant argues that insufficient evidence supported his convictions for CSC-II and domestic violence.[1] We review a challenge to the sufficiency of the evidence de novo. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011).

> [W]hen determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. [*People v Wolfe*, 440 Mich 508, 515-516; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992).]

"This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). Viewed in the light most favorable to the prosecution, we conclude that a rational trier of fact could find beyond a reasonable doubt that defendant was guilty of CSC-II and domestic violence.

As to defendant's argument that there was insufficient evidence to prove beyond a reasonable doubt that defendant was guilty of domestic violence because there was no evidence that defendant and the victim had a dating or intimate relationship, we disagree.

In relevant part, MCL 750.81(2) provides:

> an individual who assaults or assaults and batters his or her spouse or former spouse, an individual with whom he or she has or has had a dating relationship, an individual with whom he or she has had a child in common, or a resident or former resident of his or her household, is guilty of a misdemeanor . . . .

The use of the disjunctive word "or," creates four "discrete classifications, and if a victim falls within one of these classifications, the statute applies." See *In re Lovell*, 226 Mich App 84, 86; 572 NW2d 44 (1997) (analyzing a prior version of MCL 750.81(2)). The final "category applies to offenders who resided in a household with the victim at or before the time of the assault (or assault and battery) regardless of the victim's relationship with the offender." *Id*. at 87-88. In other words, "the statute applies to 'domestic' offenders broadly defined as including persons

---

[1] Defendant does not challenge his convictions for AWICSC and possession of marijuana.

-3-

joined by marriage, common parenting, [dating relationship,] or common household residence with the victim." *Id*. at 88. In this case, the victim and defendant both testified that they lived in a shared household with others at the same time. Having satisfied this classification, no additional proof of a dating or other intimate relationship was necessary to support defendant's conviction under MCL 750.81(2). See *In re Lovell*, 226 Mich App at 86-88.

We also conclude that the evidence unequivocally established the necessary elements for CSC-II. MCL 750.520c pertinently provides:

> (1) A person is guilty of criminal sexual conduct in the second degree if the person engages in sexual contact with another person and if any of the following circumstances exists:

> \* \* \*

> (f) The actor causes personal injury to the victim and force or coercion is used to accomplish the sexual contact.

CSC-II "requires the prosecutor to prove 'sexual contact.' " *People v Lemons*, 454 Mich 234, 253; 562 NW2d 447 (1997), quoting MCL 750.520c(1). "The statute defines sexual contact . . . as touching that can reasonably be construed as being for the purpose of sexual arousal or gratification." *Id*. (quotation marks and citation omitted); MCL 750.520a(q). It can also include touching the clothing covering the victim's intimate areas. See MCL 750.520a(q). "The existence of force or coercion is to be determined in light of all the circumstances, and includes, but is not limited to, acts of physical force or violence, threats of force, threats of retaliation, inappropriate medical treatment, or concealment or surprise to overcome the victim." *People v Eisen*, 296 Mich App 326, 333; 820 NW2d 229 (2012) (quotation marks omitted); MCL 750.520b(1)(f) (defining circumstances satisfying force or coercion requirement).

In this case, defendant admitted that he licked the victim's breasts for his sexual gratification. The victim's testimony established that defendant's accomplished that sexual contact through the use of force, including whipping her with a belt, scratching, biting, ripping her shirt, and physically throwing her and holding her down by her neck. To the extent that defendant argues that there was consent, the victim's testimony alone, if believed by the jury, was sufficient to prove otherwise. *People v Bailey*, 310 Mich App 703, 714; 873 NW2d 955 (2015); see also MCL 750.520h ("The testimony of a victim need not be corroborated[.]"). Defendant also repeatedly admitted that the victim did not want to go to the hotel and did not want to engage in sexual conduct with him. Moreover, several witnesses testified that the victim was yelling "rape" and extremely upset, while defendant appeared angry and was pulling up his pants. There was also evidence that defendant admitted that he became even more sexually aroused by the victim's struggles. We decline defendant's request to accept his version of events over the victim's, as we

are obliged to view the evidence in the light most favorable to the prosecution.[2]  *Wolfe*, 440 Mich at 515-516.

## III.  SENTENCING PROPORTIONALITY

Defendant also argues that his sentence was disproportionate.  We disagree.

Defendant does not argue that there was a scoring error or that the trial court relied on inaccurate information in fashioning defendant's sentence.  Nor does defendant dispute that his sentence was not within the recommended minimum guidelines range.  Because there was no scoring error and defendant's sentence was within the recommended minimum guidelines range, resentencing is not required.  See *People v Carpenter*, 322 Mich App 523, 532; 912 NW2d 579 (2018) (["I]f the defendant's sentence is within the recommended guidelines range, resentencing is not required unless there is a scoring error that changes the guidelines range or the trial court relied on inaccurate information in sentencing the defendant"); MCL 769.34(10).

## IV.  PSIR ACCURACY

Next, we consider defendant's argument that the trial court neglected to strike certain inaccurate information from his PSIR.  We agree that when a trial court finds challenged information in a PSIR inaccurate or irrelevant, it must strike that information before transmitting the PSIR to the Department of Corrections.  See *People v Spanke*, 254 Mich App 642, 649; 658 NW2d 504 (2003), overruled in part on other grounds by *People v Barrera*, 500 Mich 14; 892

---

[2] Defendant raises additional arguments in his Standard 4 brief that lack merit.  Defendant suggests that because the victim was over 18 and the Sex Offenders Registration Act (SORA), MCL 28.721 *et. seq.*, which is based on the federal Sex Offender Registration and Notification Act (SORNA), 34 USC §20911 *et. seq.*, seeks to protect minors, his consensual sexual acts with an adult victim were protected.  But SORNA's stated purpose explicitly includes "protect[ing] the public from sex offenders," 34 USC § 20901, and, likewise, SORA's stated purpose explicitly includes "preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders," MCL 28.721a.  Moreover, "[t]he creation of crimes is an inherently legislative task."  *People v Turmon*, 417 Mich 638, 650; 340 NW2d 620 (1983).  And in MCL 750.520c, the Legislature prohibited sexual contact with another person under "any of the following circumstances . . . ."  Although some of circumstances described involve a victim of a specific age, MCL 750.520(a) and (b)(*i*)-(*vi*), defendant was charged under MCL 750.520c(1)(f), which prohibits an actor from using force and coercion to engage in sexual contact with an unwilling victim regardless of her age.  MCL 750.520g(1) also prohibits assaulting a victim with the intent to commit criminal sexual conduct involving sexual penetration without mention of her age.

To the extent that defendant argues that the statutory language of CSC-II and AWICSC is vague or creates a strict liability offense, we disagree. *People v Piper*, 223 Mich App 642, 646-647; 567 NW2d 483 (1997); *People v Love*, 91 Mich App 495, 502; 283 NW2d 781 (1979).  Nor do defendant's convictions for CSC-II, MCL 750.520c(1)(f), and AWICSC, MCL 750.520g(1), violate double jeopardy because each offense contains an element that the other does not.  See *People v Nutt*, 469 Mich 565, 592; 677 NW2d 1 (2004).

NW2d 789 (2017). However, if the trial court fails to strike inaccurate or irrelevant information but does not rely on the challenged information during sentencing, resentencing is not required. See *People v Harmon*, 248 Mich App 522, 533; 640 NW2d 314 (2001).

In this case, the prosecution agrees—and the sentencing transcript record unambiguously reflects—that the trial court previously found that there was a factual inaccuracy in defendant's PSIR relating to whether a previous term of probation had been revoked as the result of a violation or discharged without improvement. Moreover, defense counsel stated he was appointed, not retained. Because there is no suggestion that the trial court relied on this challenged information when sentencing defendant, resentencing is unnecessary. See *id*. However, to the extent that the PSIR does not accurately reflect these corrections, we remand this case to the trial court solely for the ministerial task of ensuring that defendant's PSIR contains accurate information and, if correction is required, to ensure a copy is transmitted to the Department of Corrections. See *id*. at 533-534.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

In defendant's Standard 4 Brief, he first argues that defense counsel was ineffective for failing to present certain video, audio, and photographic evidence.

"This Court reviews de novo whether defense counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms and whether, without the error, the result of the proceedings would have been different." *People v McFarlane*, 325 Mich App 507, 527; 926 NW2d 339 (2018). When the trial court does not conduct an evidentiary hearing, our review "is limited to mistakes that are apparent on the record." *People v Anderson*, 322 Mich App 622, 628; 912 NW2d 607 (2018) (quotation marks omitted). Because defendant does not specifically identify or describe the evidence to which he refers, it is impossible on the existing record for us to conclude that defense counsel was ineffective. "[A] party may not announce a position and leave it to us to discover and rationalize the basis for the claim." *People v Williams*, 228 Mich App 546, 558; 580 NW2d 438 (1998).

To the extent that we might assume that defendant is referring to video footage from certain hotel cameras in the parking lot and the hotel hallway, several witnesses testified at trial that no such footage was ever recovered despite efforts by law enforcement and hotel management. Therefore, defense counsel could not have been ineffective for failing to introduce any such evidence. Moreover, defense counsel argued, albeit unsuccessfully, that the missing evidence raised reasonable doubt. "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *People v Carll*, 322 Mich App 690, 702-703; 915 NW2d 387 (2018) (quotation marks omitted). Alternatively, to the extent that we might assume that defendant is referring to the police officer's body camera footage, which was evidently edited down in preparation for trial, we must find that defense counsel's decision not to show the remainder of

those videos also amounted to trial strategy. See *id*. Notably, defendant does not explain what the nonedited body camera footage would have shown.[3]

Moreover, in light of the overwhelming evidence of defendant's guilt, including, most appreciably, defendant's own self-incriminating statements and testimony, defendant cannot establish prejudice resulting from defense counsel's chosen strategy. Notably, neither the hotel camera footage, assuming it even existed or was recoverable, nor the unedited police body camera footage, would have depicted what occurred within the hotel room. Thus, defendant's ineffective-assistance-of-counsel argument lacks merit, and for these reasons he has also failed to demonstrate the need for an evidentiary hearing under *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

## VI. PROSECUTORIAL MISCONDUCT AND ERROR[4]

Defendant also argues that the prosecutor committed misconduct by presenting testimony from a police officer that the prosecutor knew was false, by presenting hearsay testimony from the inmate, and by unfairly opining about certain evidence during closing summation, particularly in relating how the television in the hotel room was broken.

When an issue of alleged prosecutorial misconduct is unpreserved, "this Court's review is limited to plain error affecting the defendant's substantial rights." *People v Solloway*, 316 Mich App 174, 201-202; 891 NW2d 255 (2016). "To obtain relief generally requires a showing of prejudice; specifically, that the error affected the outcome of the lower court proceedings," *id*. at 202, and we "will not find error requiring reversal if a curative instruction could have alleviated the effect of the prosecutor's misconduct," *People v Lane*, 308 Mich App 38, 62; 862 NW2d 446 (2014). We reject defendant's argument that the prosecutor's conduct during trial affected his right to a fair and impartial trial.

"It is well settled that a conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment." *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009). "If a conviction is obtained through the knowing use of perjured testimony, it 'must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Id*., quoting *United States v Agurs*, 427 US 97, 103; 96 S Ct 2392; 49 L Ed 2d 342 (1976). In this case, there

---

[3] To the extent that defendant also raises the unpreserved issue that the admission of edited body camera footage constituted prosecutorial error, he cannot demonstrate plain error occurred. The jury was fully aware that only a partial tape was admitted. Moreover, in light of the other evidence, he cannot demonstrate prejudice.

[4] Defendant alleges prosecutorial misconduct throughout, but defendant's argument involves prosecutorial misconduct as well as prosecutorial error. See *People v Jackson*, 313 Mich 409, 425 n 4; 884 NW2d 297 (2015); *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). The standard of review nevertheless remains the same. See, e.g., *People v Miller*, 326 Mich App 719, 733 n 4; 929 NW2d 821 (2019) ("Nevertheless, regardless of what operative phrase is used, this Court must look to see whether the prosecutor committed errors during the course of trial that deprived defendant of a fair and impartial trial." (alterations and quotation marks omitted)).

is no evidence that a law enforcement officer perjured himself. Indeed, the officer's testimony was consistent with the other witnesses' testimony and with the police body camera video that captured the officer's response. Defendant provides no factual basis for us to conclude otherwise.

Likewise, defendant's argument that the prosecutor committed error by offering inadmissible hearsay testimony from the inmate lacks merit. Defendant asserts that the inmate's testimony was not properly offered as a statement against interest. See MRE 804(b)(3) (allowing the admission of "[a] statement which was at the time of its making so far . . . tended to subject the declarant to civil or criminal liability" when the declarant is unavailable to testify). However, the inmate's testimony contained admissions against defendant as a party opponent and thus could not contain hearsay. MRE 801(d)(2) (stating that "the party's own statement, in either an individual or a representative capacity" does not constitute hearsay under the Rules of Evidence). Therefore, the prosecutor could not have committed error by offering admissible evidence.

Lastly, nothing about the prosecutor's closing argument was so inflammatory as to prejudice defendant or deprive him of a fair and impartial trial. A prosecutor has "great latitude" in making arguments and statements at trial. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (quotation marks omitted). While afforded this "great latitude," the prosecutor may not argue facts not in evidence or mischaracterize the evidence. *Id*. at 282-283. However, prosecutors are "free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v Bailey*, 310 Mich App 703, 722; 873 NW2d 855 (2015) (quotation marks omitted). In this case, the record reflects that the prosecutor summarized the evidence regarding the destruction of the television consistently with the victim's testimony. Additionally, such summation could not have been prosecutorial error because the defendant was acquitted of the malicious destruction of property charge.

Moreover, reversal is not required when the trial court clearly instructs the jury that the lawyers' statements are not evidence. See *Meissner*, 294 Mich App at 457. The record reflects that the trial court explicitly instructed the jury that the prosecutor's remarks during argument were not evidence and were only meant to help the jury understand each side's legal theories. The trial court also adequately instructed the jury that their role was to be the fact-finder. The jury is presumed to have fully understood and followed these instructions. See *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Therefore, defendant has not shown any incidents of prosecutorial misconduct or error.

## VII. JURY INSTRUCTIONS

Finally, defendant argues that the trial court misled or erroneously instructed the jury on the application of the presumption of innocence. While it is unassailable that "[a] defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him," *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007), and that "[a] defendant is entitled to a presumption of innocence as to all charged conduct until proven guilty beyond a reasonable

doubt," *People v Beck*, 504 Mich 605, 621; 939 NW2d 213 (2019), defendant did not raise this argument before the trial court and we review his challenge only for plain error affecting substantial rights. See *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014).

The trial court in this case instructed the jury that:

A person accused of a crime is presumed to be innocent. This means that you must start with the presumption that the defendant is innocent. This presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that he is guilty.

Every crime is made up of parts called elements. The prosecutor must prove each element of the crime beyond a reasonable doubt. The defendant is not required to prove his innocence or do anything. If you find that the prosecutor has not proven every element beyond a reasonable doubt, you must find the defendant not guilty. A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of evidence. It is not merely an imaginary or possible doubt, but a doubt based on reason and common sense. A reasonable doubt is just that: A doubt that is reasonable, after a careful and considered examination of the facts and circumstances of this case.

The pattern jury instructions mirror this instruction:

(1) A person accused of a crime is presumed to be innocent. This means that you must start with the presumption that the defendant is innocent. This presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that [he / she] is guilty.

(2) Every crime is made up of parts called elements. The prosecutor must prove each element of the crime beyond a reasonable doubt. The defendant is not required to prove [his / her] innocence or to do anything. If you find that the prosecutor has not proven every element beyond a reasonable doubt, then you must find the defendant not guilty.

(3) A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of evidence. It is not merely an imaginary or possible doubt, but a doubt based on reason and common sense. A reasonable doubt is just that a doubt that is reasonable, after a careful and considered examination of the facts and circumstances of this case. [M Crim JI 1.9. & 3.2.].

"This standard jury instruction has repeatedly been held to adequately convey the concepts of reasonable doubt, the presumption of innocence, and the burden of proof." *People v Hill*, 257

Mich App 126, 152; 667 NW2d 78 (2003). Therefore, defendant has failed to prove any error here, let alone one that is plain.

Affirmed as to defendant's convictions and sentences; remanded for the ministerial task of ensuring that defendant's PSIR contains accurate information and, if not, correcting that information and transmitting to the Department of Corrections.

We do not retain jurisdiction.


/s/ Douglas B. Shapiro
/s/ Deborah A. Servitto
/s/ Anica Letica